FILED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### Western Division

90 SEP 30 PM 4: 55

U.S. DISTRICT COURT
N.D. OF ALABAMA

ROBERT BARNES, ET AL.,　　　　　)
　　　Plaintiffs;　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
-vs.-　　　　　　　　　　　　　　)　　　　No. CV-97-P-1269-W
　　　　　　　　　　　　　　　　　)
BE&K, INC.,　　　　　　　　　　　)
　　　Defendant.　　　　　　　　　)
　　　　　　　　　　　　　　　　　)

ENTERE⎯

SEP 3 0 1999

### OPINION

The defendant, BE&K, is a construction and engineering company that provides industrial services to companies in the southeast. On May 4, 1995, fifteen former and current BE&K employees filed a class action against the defendant styled CV95-P-1137-W. This court denied class certification after severing and dismissing the claims of seven plaintiffs– Robert Barnes, Robert Cunningham, Joseph George, Jerry Jones, Jessie Johnson, Major Sattiewhite, and James Southall– which were refiled in this case. All of these plaintiffs are black males who were employed by the defendant at its construction site at the International Paper Company in Mobile, Alabama, as well as other sites in the southern United States. These plaintiffs allege that the defendant discriminated against them on the basis of their race in violation of Title VII and § 1981.

BE&K performs work for different companies on a project basis. At the beginning of a project, employees are hired as needed. As a project begins to wind down, the defendant lays off employees who are no longer necessary. From time to time most of the plaintiffs have been

1

39

affected by these layoffs.  Many of them were rehired at times when BE&K expanded its workforce, for example, when it needed workers for a different project.  Most of the plaintiffs filled different positions during their employment with BE&K.  Although the plaintiffs often were given positions based on their skills and experience, in many instances they accepted employment in whatever positions were available when they were hired or rehired, occasionally accepting employment at salaries lower than those they had been receiving when they were laid off.

In November 1998, the court took three motions under submission: the defendant's Motion for Summary Judgment (docket no. 19); the plaintiffs' November 3, 1998 Renewed Motion to Compel (docket no. 35); and the defendant's November 9, 1998 Motion to Strike the plaintiffs' affidavits (docket no. 36).  For the following reasons, the defendant's motion for summary judgment is due to be granted as to the claims of all the plaintiffs except Jessie Johnson.  The plaintiffs' motion to compel and the defendants' motion to strike are due to be denied.

Plaintiffs' Renewed Motion to Compel

The plaintiffs' motion requests additional discovery materials from the defendant. However, the defendant has produced 106 transfer cases of documents in this case and has permitted the plaintiffs' counsel to examine the documents.  The plaintiffs have also requested that the defendant designate the applicability of particular documents to each of the plaintiffs' requests; however, the plaintiff's counsel has had ample opportunity to examine the available documents.  The Motion to Compel is therefore due to be denied.

<u>Defendant's Motion to Strike</u>

The defendants have moved to strike certain affidavits filed by the plaintiffs in response to the motions for summary judgment.  As the court finds that these affidavits do not constitute sham affidavits, as argued by the defendant, this motion is due to be denied.

<u>Defendant's Motion for Summary Judgment</u>

This opinion will address the factual and legal claims of each of the seven plaintiffs separately.  For the purpose of the motion for summary judgment, the court considers the presented evidence in the light most favorable to the plaintiffs.

Six of the seven plaintiffs state disparate treatment claims.[1]  To succeed on a Title VII claim of disparate treatment on the basis of race, the plaintiff must prove that the defendant's employment decisions were motivated by discriminatory intent.  <u>See</u> <u>Watson v. Fort Worth Bank and Trust</u>, 487 U.S. 977, 986 (1988).  The plaintiff can prove intentional discrimination by presenting direct evidence of a decisionmaker's discriminatory intent, <u>see</u> <u>Buckley v. Hospital Corp. of America, Inc.</u>, 758 F.2d 1525, 1529-30 (11th Cir. 1985), or by stating a case based on circumstantial evidence.  <u>See</u> <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

None of the plaintiffs have presented direct evidence that BE&K discriminated against them.  Therefore, to state a claim of disparate treatment based on circumstantial evidence, each plaintiff must meet the familiar standard of the <u>McDonnell-Douglas burden-shifting test</u>.  <u>See id</u>. at 802.  The three-pronged analysis of <u>McDonnell-Douglas</u> and its progeny has been interpreted

---

[1]Joseph George's sole claim is based on an alleged hostile work environment.

by manifold courts to apply to varied situations where an employee alleged that he or she suffered an adverse employment action.

First, the plaintiff must establish a prima facie case by showing that (1) he belongs to a protected class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action and (4) that this adverse decision was causally related to the status of the plaintiff as a member of the protected class. See Jones v. Firestone Tire and Rubber Co., 977 F.2d 527, 537-38 (11th Cir. 1992). As Title VII claims necessarily involve different factual circumstances, the particular elements of a prima facie case will vary depending on each plaintiff's specific allegations. See McDonnell-Douglas, 411 U.S. at 802, n.13. Here, the plaintiffs' claims of disparate treatment include failure to retain during a layoff, failure to promote, and discriminatory discharge.

Second, the Mc-Donnell Douglas test provides the employer an opportunity to articulate a legitimate, nondiscriminatory reason for the employment decision to rebut the presumption of discrimination raised by the plaintiff's prima facie case. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). The employer need not persuade the court that it was actually motivated by the articulated reasons, but must raise a genuine issue of material fact as to whether it discriminated against the plaintiff. See id.

Third, once the defendant articulates a legitimate reason, the burden of proof shifts to the plaintiff to show that the asserted reason was a pretext for discrimination. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993). To survive a motion for summary judgment on a claim of disparate treatment, each plaintiff must present credible evidence that a reasonable jury could find that the defendant was actually motivated by discriminatory intent.

In addition to their Title VII claims, the plaintiffs brought claims of discrimination under § 1981. Section 1981 requires that the plaintiff show intentional discrimination on the part of the defendant. General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391 (1982). The test for intentional discrimination is the same under both Title VII and § 1981. Grier v. Partek Industries, 903 F.Supp. 1480, 1491 (M.D.A.L. 1995). A plaintiff whose Title VII claims fail to meet the standards for summary judgment necessarily cannot survive summary judgment on his claims under § 1981.

### I. Robert Barnes

Robert Barnes was hired by the defendant as an electrician on November 4, 1994. On February 24, 1995, he was laid off due to a reduction in force. At the time he was laid off, he held the position of a journeyman electrician.

The plaintiff alleges that at the time of his layoff he was told that a white employee was also going to be laid off. Instead, the white employee was transferred to a truck-driving position. The plaintiff claims that the defendant also retained Al Loper, a white electrician helper, who had received warnings about his attendance. Barnes argues that he should have been transferred to the helper's position in lieu of being laid off because he was qualified for that position and had never received any warnings or disciplinary actions regarding attendance or job performance. Barnes also alleges that, although the defendant has had other reductions in its workforce, at the time of his layoff they had never had such a small reduction, and there was work available that he could have performed.

Barnes claims that the defendant discriminated against him on the basis of race by failing

5

to assign him to a different position instead of laying him off. To state a prima facie case, he must show a variation of McDonnell-Douglas's four elements. Barnes must produce evidence showing individuals outside his protected class with comparable or lesser qualifications were retained. See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984).

The plaintiff claims that two white employees were retained by the defendant: Richard Mosely and Al Loper. According to the plaintiff, Mosely was transferred to a truck-driving position although he was due to be laid off. Loper was retained as an electrician helper. The plaintiff argues that he (Barnes) should have been transferred to a different position like Mosely or given the position of electrician helper, for which he had been hired in the past.

When an employer subjects its employees to a reduction of force for economic reasons, "it incurs no duty to transfer laid-off employees to other positions within the company." Jameson v. Arrow Co., 75 F.3d 1528, 1532 (11th Cir. 1996) (applying Title VII McDonnell-Douglas test to ADEA claim). Although Barnes claims that there was work at the site he could have performed at the time of his layoff, he offers no evidence of the amount of work available at the site and whether he was qualified for it. Significantly, he admits that he was literally walking out of the gate when he "notified" BE&K that he was willing to accept a downgraded position and a lower rate of pay.[2]

Additionally, the defendant has articulated a legitimate, non-discriminatory reason for discharging the plaintiff. The defendant contends that frequent layoffs are necessary and common

---

[2]See Pl.'s Dep. At 191. Barnes told another BE&K employee, Steve Knight, that he wanted a different position as Knight was escorting him to the gate.

to the construction industry.  It argues that it chose to retain employees with greater seniority and experience than Barnes.

The plaintiff counters that discriminatory intent should be inferred simply because he was qualified for his position, and claims that defendant's articulated reason for laying off the plaintiff– that it attempts to retain the most experienced and qualified employees– was a pretext for discrimination.  The plaintiff had been in the position of electrician at BE&K for less than four months.  At his deposition the plaintiff admitted that he knew very little about the qualifications of the workers retained by the defendant.  The plaintiff has not shown that there is a genuine issue of material fact as to whether the defendant's actions in discharging him and failing to transfer him amount to intentional discrimination.  Therefore, the defendant's motion for summary judgment is due to be granted as to both Barnes' Title VII and § 1981 claims.

## II. Robert Cunningham

Plaintiff Robert Cunningham has been employed by BE&K since March 1985.  Originally hired as a laborer, he subsequently held a number of positions, including Millwright, Journeyman, and Multi-Craft Millwright "A" Mechanic ("MWAM"), the position he occupied at the time this lawsuit was filed.  He was initially hired as a laborer at $6.25 an hour.  As a MWAM, he made $13.25 an hour.

Cunningham claims that the defendant discriminated against him by compensating white employees who performed similar work at a higher rate, and in failing to promote him to the position of a "leadman."  A leadman serves to provide leadership on the crew when there is no foreman present.  For his extra duties, a leadman receives 25 cents more an hour than regular

7

journeyman pay.  The plaintiff's allegations rest on his belief that some journeymen are designated as leadmen in order to create a discrepancy in pay rates between whites and blacks.

In the complaint, Cunningham alleges that he is paid less than Matt Lewis, a white employee in the same classification, who has repeatedly quit or walked off the job.  He says that he performs the same work as a leadman, but is not compensated at that rate.

Cunningham must present evidence of a prima facie case of discrimination for defendant's failure to promote him to the position of leadman.  The elements he must demonstrate are similar to those outlined above; however, the plaintiff must show that the person who received the promotion is not a member of the protected group and had equal or lesser qualifications.  Carter v. Three Springs Residential Treatment, 132 F.3d 635, 642 (11th Cir. 1998).

As evidence of discrimination, Cunningham contends that he saw the paychecks of white employees who were performing the same functions as he was, and that their pay was 25 cents an hour more.  Cunningham compares himself to two white MCMs: Matt Lewis and Tony Williamson.

The plaintiff has alleged that Lewis was less qualified for a leadman position because he walked off the job or quit on a number of occasions.  The plaintiff has failed to submit any evidence other than his own belief that Lewis was less qualified, and admits that both Lewis and Williamson had supervised Cunningham in the past.  Even if the plaintiff could state a prima facie case on this ground, the defendant has presented a legitimate reason for its actions and the plaintiff has failed to show that this reason is a pretext for discrimination.

The defendant argues that it did not promote Cunningham to leadman because the need for leadmen at its worksites is nominal, and because those who received leadman pay had more

8

experience than the plaintiff. The plaintiff has submitted nothing to suggest that these reasons are pretextual and that the defendant acted with discriminatory intent.

In his deposition, the plaintiff also complains that Charlie Christian, a journeyman carpenter, and three other white journeymen were given leadman pay. As the plaintiff states of these other individuals, "They're not millwright journeymen. They're iron workers and carpenter fore[men]." Pl.'s Dep., 175. None of the four are similarly situated to the plaintiff and therefore cannot be useful in determining whether the defendant promoted those with lesser or equal qualifications.

Because the plaintiff has failed to provide substantial evidence that the defendant intentionally discriminated against him, the defendant's motion for summary judgment is due to be granted as to Cunningham's Title VII and § 1981 claims.


III. Joseph George

Joseph George began working for the defendant in May 1984, and worked for BE&K periodically until October 1994. He began in the position of laborer and at the time he ceased to work for the defendant, he had moved to the position of labor foreman.

At times while employed at BE&K, George worked under the supervision of Joseph Calderone, a white superintendent. He claims that during this employment, he was harassed and humiliated by Calderone. He alleges that Calderone and a man named "Tony Wilkinson,"[3] another white superintendent, verbally abused George and cursed at black employees more often

---

[3]It is unclear whether George is referring to Tony Williamson, or a different BE&K employee.

than white employees. He claims that when he quit in October 1994, this constituted a constructive discharge due to the harassment and differential treatment that he suffered.

To succeed on a claim of discrimination based on a hostile work environment, George must show that the conditions of the workplace were objectively abusive and hostile. "When the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." See Harris v. Forklift Systems, 510 U.S. 17, 21 (1993); Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995).

The conditions that George states in his complaint– cursing by white supervisors– does not rise to the level of actionable discrimination as a matter of law. Although George alleges that black employees are cursed at more often than white employees, he offers no specific descriptions of verbal abuse and harassment. He offers no proof to show that the alleged harassment was racially motivated. Therefore, the defendant's motion for summary judgment is due to be granted as to George's claims.

Additionally, the defendant argues that George's claims are barred because he failed to file an EEOC charge within the required time period. Because summary judgment is due to be granted on both of his Title VII and § 1981 claims on the grounds that George cannot show intentional discrimination as a matter of law, the court declines to discuss this issue.


IV. Jerry Jones

Jerry Jones began working for the defendant in August of 1989, and worked for BE&K on and off at several of its sites in Coden, Selma, and Mobile, Alabama. While working at the

10

Coden site, he was promoted to equipment operator. In Coden, Jones was given the opportunity to operate a lull.[4] Pl.'s Dep. 172-73. He also worked as an electrical helper at the Coden site. As a result of a reduction in force, the plaintiff was terminated and thereafter went to work for H.P. Zachary as a lull operator.

In 1993, Jones was rehired by the defendant at its Selma site as a laborer. He alleges that at the time he was hired, he was told by Joseph Calderone that, if he would take a position as a laborer (for $7 an hour), he would be given a job operating equipment when new equipment arrived at the worksite. In early January 1994, the plaintiff noticed that a lull had arrived at the worksite and was being operated by a white employee who was new to the worksite. The plaintiff asked Franklin Masters, a white General Foreman, why the white employee was operating the lull when the plaintiff had been promised a position operating new equipment when it became available. According to the plaintiff, Masters informed him that the white employee was only operating the lull temporarily, and had been hired to operate a cherry picker. The plaintiff asked the white employee whether he would be operating the cherry picker. The white employee told the plaintiff that he had no knowledge of being hired to operate a cherry picker, and only knew how to operate a lull.

The plaintiff also alleges that the defendant told him that he would be tested for a position as a warehouse forklift operator. Although plaintiff returned to work as a laborer and inquired about the training, he was never tested. Plaintiff resigned in January 1994 and claims that he was constructively discharged.

---

[4]A lull is a piece of equipment used to lift and transport smaller equipment.

Summary judgment is warranted as to both the plaintiff's Title VII and § 1981 claims. There is a genuine dispute for trial only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Grier, 903 F.Supp. at 1483 (citing Anderson v. Liberty Lobby, 477 U.S. 242, 249-50 (1986)). Here, the plaintiff has failed to submit evidence to suggest that a reasonable jury could find that BE&K intentionally discriminated against him.

Although there is some dispute, we must assume for the purposes of this motion that the plaintiff can state a prima facie case for failure to promote. First, it is undisputed that the plaintiff is black. Second, his earlier work with a lull suggests that he was qualified for the position, and the plaintiff apparently 'applied' for the position by requesting it at the time he was hired. Third he was denied the opportunity to operate a lull. Fourth, the plaintiff testified at his deposition that Jones asserts that he knew Masters was less qualified because he saw Masters operate the lull and he "could tell by his operating that he wasn't as qualified as [Jones] was." Pl.'s Dep. at 170-71. His own observation and testimony would be sufficient to create a genuine issue of fact for trial.

Although the plaintiff can state a prima facie case, summary judgment is due to be granted because BE&K states legitimate nondiscriminatory reasons for failing to provide Jones with a job operating a lull, and the plaintiff has failed to produce evidence that shows that a reasonable jury could find that these reasons are a pretext for discrimination. The defendant contends that it assigns work based on experience and "work ethic," and that at the Selma site Jones did not qualify for a promotion. BE&K's claim that Jones' work did not justify a promotion is supported by his admissions that at the Coden job he drank alcohol at lunch, and while working for BE&K

12

took small items from the worksite.[5] Pl.'s Dep. 122-24. Jones has submitted no evidence to show that these asserted reasons were pretextual.

The plaintiff's earlier experiences working for BE&K in Coden, Alabama, also contradict his claims that he was denied the position of light equipment operator for discriminatory motives rather than legitimate business reasons endemic to the construction industry. He began working in Coden under the supervision of Calderone either in 1989 or 1990. During his time in Coden, the plaintiff was promoted to the position of light equipment operator. The defendant's argument is further bolstered by the fact that at the time the plaintiff walked off the job, he was being paid at the same rate as a light equipment operator. That is the same rate he would have made if he had been operating the lull.

The plaintiff's claim that he was discriminated against by the defendant's failure to test him for a forklift job is meritless. The plaintiff admitted in his deposition that Joseph Calderone offered to test him for the forklift operator job, and then told him that there was no time on that particular day. At the end of that day the plaintiff walked off the job site and never came back. He did not provide an opportunity for the defendant to test him for the position. Therefore, the defendant's motion for summary judgment is due to be granted as to both Jones' Title VII and § 1981 claims.

---

[5]BE&K also claims that Jones cost the company $70,000- $80,000 due to a bad wire pull. A closer reading of Jones' deposition reveals that Jones' error occurred while he was working for a different employer.

<u>V. Jessie Johnson</u>

Johnson was employed by the defendant beginning in August 1992.[6]  At the time this lawsuit was filed, he was paid $11.28 an hour, and he alleged that less experienced white employees in the same classification were paid $12.75 an hour.  Johnson alleges that as an operator carpenter he performed the same work as an electrician, but was not given electrician's pay. He alleges that he was qualified for either a journeyman electrician position or a journeyman carpenter position, but that he was denied a journeyman position in favor of white employees.

In his deposition, Johnson describes a number of white individuals who, he believes, were less qualified for the position of journeyman than he was.  He bases his claims on his personal observations of these individuals at work.  In his deposition, he mentioned a Mr. Mason, Brian Brown, and Lesley Duke, and argued that they were less qualified because they were recently out of high school.  He also claims that Don Addison, a journeyman carpenter, was less qualified for a journeyman position because he had not worked for BE&K before and who, Johnson alleges, had no carpenter knowledge.  On March 19, 1995, however, Johnson was given the status of journeyman.

Johnson's allegations that less qualified whites were given journeyman positions satisfy the requirements for a prima facie case of discrimination for failure to promote.  He has offered evidence, through his deposition testimony, that white employees who were promoted to

---

[6]Although plaintiff's brief states that Johnson began his employment in 1982, that appears to be a typographical error as both Johnson's EEOC charge and the excerpts of his deposition transcript submitted to the court suggest he began as a laborer in 1992. See Pl.'s Dep. 43-45.

14

journeyman status ahead of him had equal or lesser qualifications. See Carter, 132 F.3d at 642.

BE&K asserts that it had a legitimate, nondiscriminatory reason for failing to promote Johnson because it pays workers on their work experience and "work ethic." Nevertheless, Johnson's claim that he personally observed workers who appeared to have less experience at creates a genuine issue of material fact as to whether the asserted reason is pretextual.

Johnson's allegations create a genuine issue of material fact as to whether BE&K promoted less qualified white workers to journeyman positions. Although Johnson eventually received the promotion, he argues that it came after he had filed his EEOC charge in February of 1995. Johnson's charge alleges that he was discriminated against as early as November 15, 1994. He still has a viable claim for backpay if BE&K is liable for discriminating against him. Therefore, the defendant's motion for summary judgment as to Jessie Johnson's Title VII and § 1981 claims is due to be denied.[7]

## VI. Major Sattiewhite

The plaintiff began working for the defendant in 1987. He was employed by the defendant in a number of positions, including that of iron worker. His employment at the Selma site was

---

[7]The defendant argues that all of the plaintiffs' § 1981 claims should be dismissed because they are at-will employees. The Eleventh Circuit has briefly discussed this issue in relation to a claim of qualified immunity, but has also explicitly recognized that "there is no Supreme Court or Eleventh Circuit precedent on point." Bishop v. Avera, 177 F.3d 1233, 1235-36 (11th Cir. 1999). In light of the decisions of the Tenth, Fourth and Fifth Circuits rejecting the position that § 1981 does not encompass at-will employment relationships, this court declines to adopt it here. See Perry v. Woodward, __ F.3d __, 199 WL 674476 (10th Cir.1999); Spriggs v. Diamond Auto Glass, 165 F.3d 1015 (4th Cir. 1999); Fadeyi v. Planned Parenthood Ass'n, 160 F.3d 1048 (5th Cir. 1998).

terminated on December 8, 1994. He was told that he was terminated due to unsatisfactory attendance. BE&K has a written policy that employees must call in the morning of the first day they are out sick and every day thereafter until they return to work.

The plaintiff says that he missed work December 2-8, 1994, because he was sick with influenza. He claims that he was too sick to call in the first day he was ill, and that there was no one who could have called on his behalf. On the second day he was ill, the plaintiff called in and told the defendant that he was sick and would be going to the doctor. When he called in on the third day of his illness, he was informed that he was terminated.

After his termination, Sattiewhite filed a charge of racial discrimination with the EEOC in February 1995. He also filed a claim with the Department of Labor under the Family and Medical Leave Act. As a result of that complaint, he was reinstated by the defendant and given back pay for the time he had been terminated.[8] At his deposition, the plaintiff also complained that the defendant did not fully reinstate him to 'gold key' status when he was rehired. Although the defendant argues that this claim should not be included in this case, the loss of 'gold key' status is a loss of a benefit tied to Sattiewhite's termination that properly falls within his claims against BE&K.

To survive a motion for summary judgment, the plaintiff must show that there is a genuine issue of material fact. "There is no genuine issue of material fact if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and

---

[8]Sattiewhite contends that while he was given backpay based on a forty-hour work week, he should have been paid for fifty hours per week since that was what he had been working at the time of his termination.

on which the party will bear the burden of proof." Jones v. Gerwens, 874 F.2d 1534, 1538 (11th Cir. 1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). Sattiewhite fails to make this showing.

In his complaint, Sattiewhite alleges that similarly-situated white employees who have missed work due to illness have not been terminated. To state a claim for discriminatory discharge based on circumstantial evidence, he must show that he was replaced by someone outside the protected class. See Edwards, 49 F.3d at 1521.

Under these standards Sattiewhite fails to state a viable claim of discrimination because there is no genuine issue of material fact as to whether he was replaced by someone who was not black. He has produced no evidence to suggest that he was replaced by a white person, or any other evidence showing that BE&K discriminated against him on the basis of race.

Sattiewhite's complaint suggests that his claims could be construed to allege that he was treated differently in the enforcement of a work rule. In cases involving disparate treatment in the enforcement of a work rule, the plaintiff must show either that he did not violate the work rule, or that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against others who engaged in similar misconduct. Jones v. Gerwerns, 874 F.2d 1534, 1540 (11th Cir. 1989). However, as defendant argues, the Eleventh Circuit has explicitly stated that Jones applies only to Title VII cases where the plaintiff was not terminated, and therefore cannot show that he was replaced by a person outside the protected class. Cooper-Houston, 37 F.3d 603, 605 n.4 (11th Cir. 1994).

Even if the Jones test did apply, however, there is still no genuine issue of material fact

17

to support a denial of summary judgment.  First, Sattiewhite cannot show that he did not violate the work rule.  Although he argues that the first-day rule for calling in sick was not strictly enforced, it was included in the company's written policies and he was aware of the rule at the time he became ill.  Second, he has failed to present evidence to create a genuine issue of material fact as to whether other employees were treated differently.  Sattiewhite's deposition reveals that he has no direct knowledge of any employees who were absent under similar circumstances and failed to call in the first day of their illness.  The examples he presents are those of employees who are not similarly situated.[9]  Therefore, summary judgment is due to be granted as to all of Sattiewhite's claims.

### VII. James Southall

Southall was employed by the defendant on a number of different projects from June 16, 1982 until October 1995.  He had never worked in construction before beginning his employment with the defendant.  When he started, he was paid $6.65 an hour.  In 1984, the plaintiff was hired by the defendant to work as a laborer at its site in Mobile.  He started in Mobile at $6.25 an hour, less than he had made when he first started with BE&K.  During his employment with the defendant, he held a number of different positions at BE&K sites in Alabama, Louisiana, Ohio, Virginia, Florida and Mississippi.

---

[9]At his deposition Sattiewhite claims that Herman Coleman, Allen Covington, and John Chapman also took unauthorized absences from work.  Sattiewhite admits that these employees were absent for different reasons than he was-- Covington to get married, Chapman for a car accident, and Coleman for a reason unknown to the plaintiff.  In fact, Coleman filed an affidavit in this case, but did not mention whether his absenteeism had been unauthorized.  Sattiewhite also did not know whether they violated the same rule by failing to call in on the first day of absence.

Southall contends that when he transferred positions within BE&K, his rate of pay was affected. Specifically, when Southall worked in the maintenance department as an expediter, driving a flatbed truck and distributing supplies throughout the construction site, he would temporarily transfer to the boiler department during boiler shutdowns. In this department, he worked as both an expediter and as a boilermaker. After the shutdowns, Southall would be transferred back to the maintenance department, where he only worked as an expediter. When he worked as a boilermaker, he made a higher rate of pay  than he was receiving in maintenance. When he was transferred back, he would return to the lower rate.

Southhall claims that the defendant discriminated against him by failing to pay him journeyman wages when he worked in the maintenance department and by reducing his wages by laying him off and rehiring him at a lower rate. He also alleges that black employees are laid off more frequently than white employees, and as a result white employees who are not laid off or are laid off less frequently do not suffer the same wage reductions as black employees.

The plaintiff also complains that on many occasions he complained about the wage disparities, at which time his wages would be increased. However, his wages never reached the level of white employees in his classification. He complains that he is paid less than the minimum amount set by defendant for his classification, and that white employees in his classification with less training and less seniority are paid more.

Southall does not support with substantial evidence his general allegations that black and white employees are treated differently. His contention that there is a genuine issue of fact for trial rests primarily on his allegation that he should have been paid at a higher rate when he was transferred back to maintenance. In his deposition, Southall names a number of white employees

19

in the maintenance department who he believes were paid higher rates. See Pl.'s Dep. 295. However, none of them were similarly situated to Southall because none of them were expediters. Southall admits that at the Mobile site he was the only person working as an expediter in the maintenance department, and that he was not doing the same work as the journeymen. Pl.'s Dep. at 293.

Additionally, BE&K has proffered legitimate, nondiscriminatory reasons for the plaintiff's alleged wage disparities. First, the defendant argues that maintenance and boiler employees are paid at different rates, and that Southall knew when he accepted a job as a boilermaker that it was only temporary for the time of the boiler shutdown. Second, it argues that in 1994 a representative of the defendant met with the plaintiff to discuss his wage rate. At that time, Harris told him that to make the rate he wanted, he would have to attend welding classes. The plaintiff opted not to take the classes. See Pl.'s Dep. at 242-43. However, the plaintiff has not submitted evidence that would lead a reasonable jury to the conclusion that these reasons were pretextual. Therefore, the defendant's motion for summary judgment is due to be granted as to James Southall's Title VII and § 1981 claims.

Conclusion

For the foregoing reasons, the plaintiff's Motion to Compel and the Defendant's Motion to Strike is due to be denied. The defendant's Motion for Summary Judgement is due to be granted as to plaintiffs Robert Barnes, Robert Cunningham, Joseph George, Jerry Jones, Major Sattiewhite, and James Southall. The defendant's motion is due to be denied as to the claims of Jessie Johnson.

20

Dated: _Sep. 30_ , 1999

_Sam C. Pointer_

Chief Judge Sam C. Pointer, Jr.

Service List:
      Charles M. Thompson
      Lisa A. Schreter
      Stephen X. Munger
      John Derek Wales
      Mac C. Moorer

21